BRIEF FOR APPELLEE

_____

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

NO. 14-4418

_____

UNITED STATES OF AMERICA,

Appellee,

v.

CHRISTOPHER STEWART WILSON,

Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

_____

BRIEF OF THE UNITED STATES

_____

THOMAS G. WALKER
United States Attorney

BY:  JENNIFER P. MAY-PARKER
PHILLIP A. RUBIN
Assistant United States Attorneys
310 New Bern Avenue
Suite 800
Raleigh, North Carolina 27601
Telephone:  (919) 856-4530

Attorneys for Appellee

_____

_____

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES...........................................ii

STATEMENT OF JURISDICTION.......................................1

STATEMENT OF ISSUES............................................2

STATEMENT OF FACTS............................................3

SUMMARY OF ARGUMENT...........................................21

ARGUMENT.....................................................23

I.   DEFENDANT'S CONVICTION SHOULD BE AFFIRMED BECAUSE HE
     CANNOT SHOW THAT THE DISTRICT COURT'S STATEMENTS AT
     THE FIRST ARRAIGNMENT LIKELY AFFECTED HIS PLEA
     DECISION FOUR MONTHS LATER...............................23

     A.   Standard of Review.................................23

     B.   Discussion of Issue................................23

II.  BY ENTERING AN UNCONDITIONAL GUILTY PLEA, DEFENDANT
     WAIVED ANY CHALLENGE TO THE DISTRICT COURT'S ORDER
     DENYING HIS MOTION TO SUPPRESS..........................32

     A.   Standard of Review.................................32

     B.   Discussion of Issue................................32

III. THE DISTRICT COURT PROPERLY DENIED DEFENDANT'S MOTION
     TO SUPPRESS BECAUSE NO WARRANT WAS REQUIRED FOR POLICE
     TO TEMPORARILY INSTALL A TRACKING DEVICE ON
     DEFENDANT'S VEHICLE, AND BECAUSE THE GOOD-FAITH
     EXCEPTION APPLIES.......................................34

     A.   Standard of Review.................................34

     B.   Discussion of Issue................................34

          1.   No Search Warrant Was Required for Police to
               Track Defendant's Car Using a GPS Unit.........35

          2.   Even If the Search Violated the Fourth
               Amendment, the Good-Faith Exception Applies......41

CONCLUSION...................................................46

CERTIFICATES OF COMPLIANCE AND SERVICE

TABLE OF AUTHORITIES

CASES

Blackledge v. Perry, 417 U.S. 21 (1974)........................33

Cardwell v. Lewis, 417 U.S. 583 (1974)......................38–39

Davis v. United States, 131 S. Ct. 2419 (2011)..............42–43

Grady v. North Carolina, No. 14-593, 2015 WL 1400850
   (U.S. Mar. 30, 2015) (per curiam)...........................41

Griffin v. Wisconsin, 483 U.S. 868 (1987).....................36

Herring v. United States, 555 U.S. 135 (2009)...............42–43

Hudson v. Michigan, 547 U.S. 586 (2006).......................42

Samson v. California, 547 U.S. 843 (2006).................36, 39

State v. Parker, 644 S.E.2d 235 (N.C. App. 2007)..............45

Terry v. Ohio, 392 U.S. 1 (1968)..........................35, 37

Tollett v. Henderson, 411 U.S. 258 (1973).................32–33

United States v. Bradley, 455 F.3d 453
   (4th Cir. 2006).........................................passim

United States v. Broce, 488 U.S. 563 (1989)...................33

United States v. Chadwick, 433 U.S. 1 (1977)..................38

United States v. Cuevas-Perez, 640 F.3d 272
   (7th Cir. 2011).......................................44–45

United States v. Davila, 133 S. Ct. 2139 (2013)...........passim

United States v. Hill, 776 F.3d 243
   (4th Cir. 2015).......................................39–40

United States v. Jones, 132 S. Ct. 945 (2012).............passim

United States v. Kelly, 592 F.3d 586
   (4th Cir. 2010).........................................34

ii

<u>United States v. Knights</u>, 534 U.S. 112 (2001)...........35–36, 40

<u>United States v. Knotts</u>, 460 U.S. 276 (1983)...............passim

<u>United States v. Moussaoui</u>, 591 F.3d 263
  (4th Cir. 2010)..........................................32

<u>United States v. Olano</u>, 507 U.S. 725 (1993)...................23

<u>United States v. Robinson</u>, No. 13-3253, 2015 WL 1314493
  (8th Cir. Mar. 25, 2015).................................45

<u>United States v. Sanya</u>, 774 F.3d 812
  (4th Cir. 2014)......................................passim

<u>United States v. Sparks</u>, 711 F.3d 58
  (1st Cir. 2013)......................................44–45

<u>United States v. Stephens</u>, 764 F.3d 327
  (4th Cir. 2014)......................................passim

<u>United States v. Wiggins</u>, 905 F.2d 51
  (4th Cir. 1990)..........................................33

<u>STATUTES</u>

18 U.S.C. § 2..............................................3, 18

18 U.S.C. § 371...............................................3

18 U.S.C. § 922(g)............................................4

18 U.S.C. § 924(c)......................................passim

18 U.S.C. § 1951..........................................3, 18

18 U.S.C. § 1951(a).......................................3, 18

18 U.S.C. § 2113(a).......................................3, 18

18 U.S.C. § 3231..............................................1

18 U.S.C. § 3742(a)...........................................1

28 U.S.C. § 1291..............................................1

## RULES

Fed. R. Crim. P. 11..........................................25

Fed. R. Crim. P. 11(a)(2)...................................33

Fed. R. Crim. P. 11(c)......................................26

Fed. R. Crim. P. 11(c)(1)...............................passim

Fed. R. Crim. P. 11(h)......................................24

Fed. R. Crim. P. 52(a)......................................24

Fed. R. Crim. P. 52(b)......................................23

## SENTENCING GUIDELINE

USSG §3E1.1.................................................19

<u>STATEMENT OF JURISDICTION</u>

Defendant Christopher Stewart Wilson appeals from a judgment of conviction following a guilty plea.  Jurisdiction to the district court was established by 18 U.S.C. § 3231.

Jurisdiction to this Court is provided by 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).  The judgment was entered on May 16, 2014, and Defendant filed a timely notice of appeal on May 21, 2014.

STATEMENT OF ISSUES

    I.      Whether Defendant can demonstrate a reasonable probability that the district court's statements about the plea negotiations caused him to change his plea decision four months later.

    II.     Whether Defendant may challenge the denial of his suppression motion even after he waived all prior nonjurisdictional defects by entering a plea of guilty.

    III.    Whether the district court erred in denying Defendant's motion to suppress information gained from a GPS tracker placed on his vehicle while he was on supervised release and subject to electronic monitoring of his home detention.

2

<u>STATEMENT OF FACTS</u>

<u>Procedural History</u>

Defendant Christopher Stewart Wilson and three coconspirators were indicted by the grand jury on October 24, 2012, on fifteen counts relating to a series of bank and convenience-store robberies. (J.A. 17-28). Defendant was named in thirteen of the counts.[1] The charges included the following:

- One count of conspiracy to interfere with commerce by threats and violence in violation of the Hobbs Act, 18 U.S.C. § 1951(a) (Count One);

- Three counts of interference with commerce by threats and violence through robbery, and aiding and abetting, in violation of 18 U.S.C. §§ 1951 and 2 (Counts Two, Five, and Seven);

- Three counts of violating of 18 U.S.C. §§ 924(c) and 2 by possessing a firearm in furtherance of those robberies, and aiding and abetting (Counts Three, Six, and Eight); and

- Six counts of bank robbery and aiding and abetting bank robbery, in violation of 18 U.S.C. §§ 2113(a) and 2 (Counts Four and Eleven through Fifteen).

(J.A. 17-28). On October 9, 2013, the United States issued a superseding information charging Defendant with additional counts of conspiracy under 18 U.S.C. § 371 (Count One) and being

---

[1] Defendant was originally named in Count Ten as well, but that appears to have been an error. Count Ten was a violation of 18 U.S.C. § 924(c), but Defendant was not named in the count that violation relates to, Count Nine. (J.A. 24-25). Count Ten was dismissed as to Defendant on November 9, 2012. (J.A. 4, Docket Entry 35).

a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) (Count Two). (J.A. 54–57). These additional charges were part of a negotiated plea agreement. (J.A. 63–64)

Defendant signed the plea agreement with the government, but he backed out of that agreement at his first arraignment, held on October 15, 2013. (J.A. 59). The district court continued the proceedings after discussing the plea with Defendant, his counsel, and government counsel. (J.A. 74). Defendant received new counsel a month later, and three months after that he signed another plea agreement with the government. (J.A. 82–93). He entered a plea of guilty on February 3, 2014, to the two counts from the superseding information and four of the bank robberies from the original indictment (Counts Twelve through Fifteen). (J.A. 103–04).

On May 15, 2014, the district court sentenced Defendant to imprisonment for a total of 293 months. (J.A. 13, Docket Entry 173). Because Defendant was on supervised release at the time of his criminal conduct, the district court revoked his supervision at the same hearing and sentenced him to 20 additional months of imprisonment. (J.A. 14, Docket Entry 197, at 7–8).

<u>Defendant's Transfer of Supervised Release</u>

Prior to the offense conduct in this case, Defendant was on a term of supervised release ordered by the Southern District of

Texas as part of an August 2008 criminal judgment. (S.J.A. 135–41). Defendant's supervised release was transferred to the Eastern District of North Carolina in November 2010, and the court ordered modifications to Defendant's supervised-release terms in October 2011 after he violated the terms of his release by leaving the judicial district. (S.J.A. 135, 145–47). The revised supervised-release conditions included the following home-detention requirement:

> The defendant shall abide by all conditions and terms of the home detention program for a period not to exceed 120 consecutive days. The defendant shall be restricted to his residence at all times except for pre-approved and scheduled absences for employment, education, [and other specified activities] as approved by the probation officer. The defendant shall wear an electronic monitoring device and follow electronic monitoring procedures specified by the probation officer.

(S.J.A. 147). All of the offense conduct described in the following pages occurred while Defendant was on supervised release, and all but the first robbery occurred after the district court had entered its order on October 12, 2011, adding the conditions of home detention and electronic monitoring.

### Bank and Convenience Store Robberies

Defendant was the "leader and organizer" of a series of nine bank and convenience-store robberies in the fall of 2011. (S.J.A. 151, ¶ 6). He "recruited and directed" the other participants in the robberies, including two juveniles. (S.J.A.

151, ¶ 6). In each of the robberies, Defendant either participated himself or assisted the crime by communicating with the robbers via cellular telephone, sometimes while listening to a police scanner. (S.J.A. 151, ¶ 6).

The first robbery occurred on October 9, 2011, when Defendant and Marvin Cummings entered the Sunoco Convenience Store in Fayetteville, North Carolina. (S.J.A. 151, ¶ 7). Cummings pointed a firearm at the store's clerk and demanded money while Defendant served as a lookout. (S.J.A. 151, ¶ 7). Cummings stole $450 and left, and Defendant stayed behind and acted as though he was a customer present for the robbery. (S.J.A. 151, ¶ 7). When questioned by police, Defendant gave a false name. (S.J.A. 151, ¶ 7).

The next robbery, of Lumbee Guaranty Bank in Fayetteville, occurred on October 14, 2011. (S.J.A. 152, ¶ 10). Defendant recruited Buddy Christian to participate in the robbery and allowed Christian and Cummings to use his car as a getaway car. (S.J.A. 152, ¶ 9). Christian wrote the demand note, which said, "Give me the money, I have a gun, panic you die." (S.J.A. 152, ¶¶ 9-10). Christian and Cummings gave the note to the bank teller and robbed the bank of $3,064. (S.J.A. 152, ¶ 10). They then abandoned Defendant's car near the mobile home park where Defendant lived (S.J.A. 108), and Defendant "divided the robbery

money and paid Cummings and Christian for their involvement" (S.J.A. 152, ¶ 10).

The same day as the Lumbee Guarantee Bank robbery, police found Defendant's car and interviewed him at the University of Phoenix, where he was a student. (S.J.A. 108). Defendant said that he loaned his car to a "Michael Smith." (S.J.A. 108). Police later that day interviewed Defendant and his wife at their home. (S.J.A. 108). Defendant said that he was flagged down by Smith while on the way to the university and that he loaned Smith the car to visit his girlfriend. (S.J.A. 108). Defendant said he did not know Smith's address or telephone number. (S.J.A. 108). Examining pictures from the robbery, Defendant identified the shorter robber as Smith but said he did not recognize the taller one; Defendant's wife identified the shorter robber as Smith and the taller one as her nephew, Marvin Cummings. (S.J.A. 108–09).

Law enforcement continued investigating, and on October 19, 2011, a fingerprint from the demand note used at the Lumbee Guaranty Bank robbery was identified as belonging to Buddy Christian. (S.J.A. 109). The next day, the detective showed Defendant's wife a picture of Christian and asked if she could identify him; she said she knew the person as Mike Smith. (S.J.A. 109-10). Defendant arrived home after, and he

identified the picture as Buddy Christian and denied that he knew the man as Mike Smith. (S.J.A. 110).

The robberies continued during the police investigation. Defendant recruited a juvenile to participate with Cummings in the October 29, 2011, robbery of a Short Stop Convenience Store, giving the juvenile marijuana to use before the crime. (S.J.A. 155, ¶¶ 30-31). Cummings and the juvenile entered the store, and Cummings robbed the clerk, at gunpoint, of $80.48 while the juvenile served as a lookout. (S.J.A. 155, ¶ 31). Defendant then transported Cummings and the juvenile to Defendant's residence, where they divided the proceeds. (S.J.A. 155, ¶ 31).

Similarly, Defendant recruited his half-sister, Josephine Johnson, along with the same juvenile, to rob the Kangaroo Convenience Store the next day, October 30, 2011. (S.J.A. 156, ¶ 33). Johnson drove Defendant, Cummings, and the juvenile to the store, and Defendant remained in the car while Cummings and the juvenile robbed the clerk, at gunpoint, of $75. (S.J.A. 156, ¶ 34). The robbers again returned to Defendant's residence and divided the proceeds. (S.J.A. 156, ¶ 34).[2]

Defendant then returned to robbing banks. He recruited Johnson to assist in a fifth robbery, of an RBC Centura Bank, on

---

[2] The same day, another Short Stop Convenience Store was robbed by two males. (S.J.A. 111). Cummings and Johnson were indicted with that crime, but Defendant was not. (J.A. 19).

November 1, 2011. (S.J.A. 152, ¶ 12). Johnson drove Cummings and the juvenile to the bank, where the juvenile presented a demand note. (S.J.A. 152, ¶ 12). The robbers left with $1,095.99, and Johnson transported them to Defendant's home where Defendant divided the proceeds. (S.J.A. 152, ¶ 12).

Cummings was arrested in early November for his role in the previous robberies (S.J.A. 152, ¶ 14), but Defendant and his other coconspirators pressed on. Defendant recruited the juvenile from the previous robberies, as well as Johnson and another juvenile, to rob the First Citizens Bank and Trust in Fayetteville. (S.J.A. 152, ¶ 14). Defendant picked the juveniles up from school on November 4, 2011, giving them marijuana to use while he instructed them on how to rob the bank. (S.J.A. 152, ¶ 15). He also gave one of the juveniles clothing similar to that worn by Cummings in the previous robberies, in hopes that law enforcement would conclude Cummings was innocent. (S.J.A. 152–53, ¶ 15). Johnson then drove the juveniles to the bank, and once she received word from Defendant by cellular telephone,[3] the juveniles entered the bank and presented a demand note stating, "Give all your money, I have a loaded gun." (S.J.A. 153, ¶ 15). The juveniles stole $3,210

---

[3] Defendant, apparently in an attempt to secure an alibi, signed into school before instructing the robbers to proceed. (S.J.A. 153, ¶ 15 n.1).

from the bank, and Johnson picked them up and transported them to Defendant's home, where Defendant again divided the proceeds. (S.J.A. 153, ¶ 15).

Defendant then planned and organized two additional bank robberies, both on November 7, 2011. He recruited the two juveniles and Johnson to commit the robberies, providing marijuana to the juveniles before the crime and offering them a handgun, which they refused. (S.J.A. 153, ¶ 17). First, Johnson drove the juveniles to a First South Bank branch in Fayetteville, where the juveniles presented a demand note and stole $1,255. (S.J.A. 153, ¶ 18). Then, Johnson drove the juveniles to another First South Bank branch, where the juveniles presented an identical demand note and stole $858. (S.J.A. 153, ¶ 21). Johnson then drove the juveniles to a hospital, where Defendant's wife was being treated for a stroke, and Defendant divided the robbery proceeds at that location. (S.J.A. 153–54, ¶ 21).

By the time Defendant was preparing for what would be his final robbery, police had identified Defendant, Cummings, Christian, and one of the juveniles as active participants in the robberies, based on witness interviews and surveillance videos. (S.J.A. 111). Following that identification, detectives with the Fayetteville Police Department installed a GPS tracking unit on Defendant's car while Defendant was parked

at his probation officer's office on November 14, 2011. (S.J.A. 111). The detectives did this in coordination with Defendant's probation officer. (J.A. 43).

During that same visit to his probation officer, Defendant instructed Johnson via cellular telephone to begin the robbery, which he had organized, of a First Citizens Bank and Trust branch. (S.J.A. 154, ¶ 24). Johnson drove one of the juveniles to the bank, where he presented a demand note and stole $1,317. (S.J.A. 154, ¶ 24). Johnson then drove the juvenile to another bank, but he reported that law enforcement officers were present at that location. (S.J.A. 154, ¶ 24). Johnson and the juvenile then met Defendant, who divided the proceeds, and Defendant instructed Johnson to dispose of all of the clothing used in the robberies. (S.J.A. 154, ¶ 24).

Officers began tracking Defendant when he left the probation office. A detective tried to follow him while others monitored the GPS tracking, but the detective was unable to consistently maintain physical surveillance while Defendant drove to various locations in Fayetteville. (S.J.A. 111). After officers electronically located Defendant's vehicle travelling toward the 1600 block of Cumberland Drive in Fayetteville, the detective traveled toward that location and passed Defendant's vehicle coming from that direction. (S.J.A. 111–12). The detective was not able to keep visual

11

surveillance, but officers again electronically located
Defendant's car later in the day near the 400 block of Grove
Street. (S.J.A. 112). A detective arrived and observed someone
in the passenger seat of Defendant's parked vehicle. (S.J.A.
112). As the passenger exited the vehicle, the detective
recognized him as one of the juveniles from the robberies and
arrested him. (S.J.A. 112). Detectives then located Defendant
in an adjacent building and arrested him as well. (S.J.A. 112).
The detectives then removed the GPS device from Defendant's
vehicle. (S.J.A. 112).

Detectives later visited the first location they had
electronically located Defendant traveling to, 1662 Cumberland
Drive, and they found the residence of Josephine Johnson.
(S.J.A. 112). She gave officers permission to search her
residence, and they found in a dumpster clothing and items
similar to those used during the robberies. (S.J.A. 112).
Johnson confessed to her role in the robberies and stated that
Defendant's wife had instructed her to put the clothes in the
dumpster. (S.J.A. 112-13).

### Defendant's Motion to Suppress

After he was indicted, Defendant filed a motion to
suppress, arguing that the use of the GPS unit constituted an
illegal search under the Supreme Court's ruling in United States
v. Jones, 132 S. Ct. 945 (2012), which was decided after the

officers used the GPS unit in this case. (J.A. 29-34). He argued that under Jones the attachment of a GPS unit was a trespass and therefore a search, and thus the use of the GPS unit without a warrant violated the Fourth Amendment. (J.A. 32).

The government responded in two ways. First, government counsel argued that even though the attachment of a GPS unit constitutes a search, neither a warrant nor probable cause is required to monitor a vehicle for locational data on public streets. (S.J.A. 119). Jones left this question unresolved, the government argued, and the use of a GPS unit in cases such as this should require only reasonable suspicion because the GPS unit was minimally intrusive, it was installed for only a brief period when the vehicle was exposed to public view, and Defendant had a reduced privacy interest due to his supervised release and home detention with electronic monitoring. (S.J.A. 120). Second, the government argued that the good-faith exception should apply because the pre-Jones case law that controlled at the time held that use of electronic tracking on vehicles was neither a search nor a seizure. (S.J.A. 129 (citing United States v. Knotts, 460 U.S. 276 (1983))).

The district court held a suppression hearing on August 23, 2013, where the parties discussed these arguments. (J.A. 35, 39-47). The court denied Defendant's motion at the hearing

13

(J.A. 47–48) and issued a written order on September 3, 2013 (J.A. 50–53). The court explained in its order that Defendant "was well-aware that his location was being monitored[,] as [his] probation officer was <u>required</u> to know whether [he] was abiding by his conditions of confinement and was at his home when he was supposed to be." (J.A. 51). The court also found that Defendant had no reasonable expectation of privacy in that regard, and the government's intrusion was brief and minimal. (J.A. 51–52). Furthermore, the court found that even if the search violated the Fourth Amendment, the good-faith exception applied because although there was no Fourth Circuit case law on the use of GPS devices at the time, Supreme Court precedent permitted the warrantless use of beepers to track cars, and ample precedent from other circuits specifically permitted warrantless use of GPS units. (J.A. 52–53).

<u>First Plea Agreement and Initial Rule 11 Hearing</u>

After the district court denied Defendant's motion to suppress, Defendant signed a plea agreement with the United States. (J.A. 59). There, he agreed to plead guilty to some of the counts from the indictment as well as some lesser counts added in a superseding criminal information, which the government filed as part of the agreement. (J.A. 64–66).

At Defendant's Rule 11 hearing on October 15, 2013, Defendant's counsel notified the court that Defendant wished to

back out of the plea agreement.  (J.A. 59).  Defendant's counsel told the court that communication with his client had "broken down," and that Defendant "no longer intend[ed] to heed [counsel's] advice on how to best proceed with this case." (J.A. 59).  Defense counsel sought to withdraw from the case and have another attorney appointed instead.  (J.A. 59–60).  He indicated that he hoped the new attorney would be able to advise Defendant "on the benefits of moving forward with the plea as negotiated."  (J.A. 60).

The district court asked about Defendant's sentencing exposure absent the plea agreement.  Specifically, the district court confirmed with government counsel that Defendant, if convicted, faced 57 years of imprisonment consecutive to any other sentence, due to his three counts of violating 18 U.S.C. § 924(c).  (J.A. 60–61).  In all, the court observed, if Defendant were convicted after a trial, he would receive a sentence of around 900 to 1,000 months.  (J.A. 61–62).

The district court then addressed Defendant, asking him about his experience in state court, which might be giving him a "false sense of security." (J.A. 62).  Defendant told the court that he had served eight years in state prison, and he also told the judge that he would "like to plead guilty to the superseding information, if that's possible." (J.A. 63).  Government counsel and defense counsel explained that it was not possible

15

for Defendant to plead only to the superseding information because, as part of the negotiated plea agreement, those counts were substitutes for only some of the counts from the indictment. (See J.A. 63–66).

After discussing the plea arrangement with the attorneys, the district court addressed Defendant again, asking, "What's your problem? I mean, you are facing an ocean full of time and they've got it – you think you are going to get out? You are not going to get out. I mean, what's your problem?" (J.A. 68). Defendant responded that he was only willing to plead guilty "to the charges that [he] actually committed," which were the counts from the superseding information. (J.A. 68).

The Court then asked government counsel if Defendant's coconspirators were going to testify at Defendant's trial, and government counsel said they would do so. (J.A. 69). The district court then told Defendant, "I don't need to tell you anything. I don't need to be considered, but you're going to end up with a sentence of a hundred years, or something like that." (J.A. 69). After continued discussion, the district court asked Defendant what he thought was going to happen with his trial. (J.A. 71). Defendant again said that he wished to plead guilty to the superseding information, and when the court told him that was not possible, Defendant said, "Okay, then plead not guilty." (J.A. 71–72). The court told Defendant that

16

he would "have a trial, then [] get convicted of all the crimes," and then go to prison until he was nearly 104 years old. (J.A. 72). Defendant said that he could not plead guilty to crimes he did not commit, and the court responded that Defendant's coconspirators would testify against him at trial in order to receive sentencing reductions, and if Defendant insisted on testifying, the jury would find out that he spent time in state prison for robbery. (J.A. 72-73).

Defendant confirmed that he understood the potential consequences, and the court asked him if he wanted a new attorney. (J.A. 73). Defendant said he was happy with his representation and did not request new counsel. (J.A. 73). Based on that response, the district court told the parties to "take a cooling off period" for two weeks. (J.A. 74). Defense counsel agreed to continue representing Defendant over that time, and the court said that it would reconsider defense counsel's withdrawal motion later if he still desired. (J.A. 74-75).

Defense Counsel Withdrawal, Plea Agreement, and Guilty Plea

Ten days later, Defendant's attorney renewed his motion to withdraw, stating that the attorney-client relationship "ha[d] deteriorated beyond repair," and that "Defendant's reactions to counsel's inquiries" during a recent visit were "either nonresponsive or inappropriate." (J.A. 77-78). Five days

17

later, on October 30, 2013, the district court granted defense counsel's motion (J.A. 81), and a new attorney was appointed to represent Defendant (J.A. 11, Docket Entry 136).

Three months after receiving new counsel, Defendant signed the plea agreement with the government. (J.A. 93). He agreed to plead guilty to Counts Twelve through Fifteen of the indictment (four counts of bank robbery) and to the two counts of the superseding criminal information (conspiracy to commit bank robbery and being a felon in possession of a handgun). (J.A. 82, 84–89). In exchange for his guilty plea, the government agreed to dismiss a significant number of charges:

- Count One: Conspiracy to interfere with commerce by robbery under the Hobbs Act, 18 U.S.C. § 1951(a);

- Counts Two, Five, and Seven: Interference with commerce by robbing three convenience stores and aiding and abetting, in violation of 18 U.S.C. §§ 1951 and 2;

- Counts Four and Eleven: Two bank robberies and aiding and abetting, in violation of 18 U.S.C. §§ 2113(a) and 2; and

- Counts Three, Six, and Eight: Three counts of using a weapon in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c).

(J.A. 91; J.A. 17–26).

18

Defendant and his new counsel signed the plea agreement on February 3, 2014. (J.A. 93). The same day, Defendant entered a plea of guilty at a Rule 11 hearing to the counts specified in the plea agreement. (J.A. 12, Docket Entry 151). The transcript of that hearing is unavailable due to technical issues, but defense counsel has filed a statement acknowledging that the district court inquired with Defendant as to whether he understood the terms of the plea agreement, that the court instructed Defendant that he could not withdraw his plea once he entered it, and that Defendant entered a plea of guilty to the counts specified in the plea agreement. (J.A. 103–04).

### Presentence Investigation Report and Sentencing

After Defendant pleaded guilty pursuant to the plea agreement, the United States Probation Office conducted a presentence investigation and issued a presentence investigation report. (S.J.A. 148–75).

The probation officer calculated the offense level for each of Defendant's counts of conviction (S.J.A. 163–67, ¶¶ 75–128), and he determined that Defendant's combined adjusted offense level was 38 (S.J.A. 167, ¶ 132). After deducting three levels for acceptance of responsibility under USSG §3E1.1, Defendant's total offense level was 35. (S.J.A. 168, ¶ 135).

Defendant had prior convictions for five felonies and five misdemeanors. (S.J.A. 157–59, ¶¶ 44–50). Only Defendant's

three most recent felonies——for robbery with a dangerous weapon, transportation of an unlawful alien, and possession of marijuana——counted toward his criminal history score, giving him a criminal history subtotal of 7. (S.J.A. 158–59, ¶¶ 48–50, 52). Because Defendant was on supervised release when he committed the current offenses, the probation officer increased his criminal history score by 2, resulting in a total criminal history score of 9 and category of IV. (S.J.A. 159–60, ¶¶ 53–54).

Based on Defendant's total offense level of 35 and criminal history category of IV, the guideline range for his offense was 235 to 293 months. (S.J.A. 168, ¶ 137).[4] Defendant was sentenced on May 15, 2014, to a total of 293 months' imprisonment——113 months on Counts Twelve through Fifteen, 60 months consecutive on Count One of the criminal information, and 120 months consecutive on Count Two of the criminal information. (J.A. 13, Docket Entries 172–73). The district court revoked Defendant's supervised release at the same hearing, issuing a revocation sentence of 20 months consecutive to the other punishments. (J.A. 14, Docket Entry 197, at 7–8, 51).

---

[4] Defendant filed a number of objections to the PSR (S.J.A. 172–75), but none of those objections are at issue in this appeal.

<u>SUMMARY OF ARGUMENT</u>

1.   This Court should affirm Defendant's conviction. While the district court's statements about the plea agreement did run afoul of Rule 11(c)(1), Defendant still must demonstrate a reasonable probability that the court's statements caused him to change his plea.  He cannot meet that burden on the facts of this case.

Unlike cases where this court has reversed convictions after a Rule 11(c)(1) violation, Defendant gave no indication at his first arraignment that the district court had convinced him not to back out of his original plea agreement or to return to the negotiating table.   Instead, as his attorney's withdrawal two weeks after the hearing suggests, Defendant continued after the hearing to reject the plea agreement he had originally signed.  It was only when nearly four months had passed, and on advice from a new attorney, that Defendant decided to re-sign the plea agreement.  Furthermore, the plea agreement itself——not the district court's statements four months prior——is the most reasonable explanation for Defendant's guilty plea.  Defendant's plea agreement reduced his sentencing exposure by <u>decades</u>, and that was the most compelling reason for him to plead guilty.

2.   If this Court affirms Defendant's guilty plea and conviction, it should decline to address his challenge to the court's order denying his motion to suppress.  An unconditional

21

plea of guilty waives all prior non-jurisdictional defects, and Defendant's guilty plea was unconditional.

3.   If the Court does address Defendant's challenge to the order denying his motion to suppress, the Court should affirm the district court's decision for two reasons:

First, even in light of Jones, a warrant was not required for police to attach a GPS tracking unit to Defendant's vehicle while he was on supervised release and subject to electronic monitoring as part of his home detention.  The physical intrusion on Defendant's vehicle was minimal, Defendant's right to and expectation of privacy were severely reduced, and the government had significant evidence showing that Defendant was engaged in an ongoing conspiracy to commit violent robberies. The test for Fourth Amendment violations is reasonableness, and based on these facts the warrantless search was reasonable.

Second, even if the use of the GPS device violated the Fourth Amendment in light of Jones, this Court has already held that, prior to Jones, officers could reasonably have relied on older Supreme Court case law to conclude that such searches did not require a warrant.  Here, the search occurred prior to Jones, and under this Court's published decision in United States v. Stephens, 764 F.3d 327, 337–38 (4th Cir. 2014), the good-faith exception applies.  Thus, the district court properly denied Defendant's motion to suppress.

<u>ARGUMENT</u>

I.  DEFENDANT'S CONVICTION SHOULD BE AFFIRMED BECAUSE HE CANNOT SHOW THAT THE DISTRICT COURT'S STATEMENTS AT THE FIRST ARRAIGNMENT LIKELY AFFECTED HIS PLEA DECISION FOUR MONTHS LATER.

A.  <u>Standard of Review</u>.

Because Defendant did not challenge his arraignment and guilty plea in the district court, this Court will review his argument only for plain error.  <u>United States v. Davila</u>, 133 S. Ct. 2139, 2148 (2013); Fed. R. Crim. Proc. 52(b).

B.  <u>Discussion of Issue</u>.

Defendant seeks reversal of his guilty plea and conviction, arguing that the district court violated Federal Rule Criminal Procedure 11(c)(1) by improperly participating in his plea discussions.  (Brief at 6-16).  Because Defendant raises this claim for the first time on appeal, his argument is subject to plain-error review.  <u>United States v. Davila</u>, 133 S. Ct. 2139, 2148 (2013).  Under plain-error review, Defendant must show not only that an error occurred but also that the error was plain and that it affected his substantial rights.  <u>United States v. Olano</u>, 507 U.S. 725, 732-34 (1993).  In the context of a court's participation in plea negotiations, this means that Defendant must demonstrate "a reasonable probability that, but for the error, he would not have pleaded guilty."  <u>United States v. Sanya</u>, 774 F.3d 812, 816 (4th Cir. 2014) (internal quotation marks and citation omitted).

23

On this record, Defendant can show that the district court's participation in the plea discussions ran afoul of Rule 11(c)(1), and that the error was plain. C.f. Sanya, 774 F.3d at 816–17. But Defendant cannot show that the error affected his substantial rights. He did not enter into his final plea agreement until nearly four months after the district court's improper statements, and in that time he received advice from a new attorney. The evidence against Defendant was strong, and the immense benefits he received from the plea agreement are the best explanation for his guilty plea. Because Defendant cannot meet his burden under plain-error review, his conviction should be affirmed.

The Supreme Court recently addressed the consequences of a Rule 11(c)(1) violation in United States v. Davila, 133 S. Ct. at 2145. There, the Court resolved a circuit split between those courts that automatically vacated convictions after finding such an error and those that subjected such errors to plain-error review. Id. at 2146 n.2 (citing, among others, United States v. Bradley, 455 F.3d 453, 461 (4th Cir. 2006)).

Siding with this Court and others that applied plain-error review to Rule 11(c)(1) errors, the Supreme Court explained that "Rule 11 errors are not excepted from [the] general [r]ule" that errors not affecting substantial rights must be disregarded. Id. at 2147 (citing Rules 52(a) and 11(h)). And nothing in the

24

text of Rule 11 suggests that Rule 11(c)(1) errors should be treated differently than other Rule 11 errors by automatically vacating the plea. Id. at 2148.

In reaching that conclusion, the Supreme Court necessarily recognized that a circuit court may affirm a conviction even though the district court committed a plain error by involving itself in the plea negotiations. See id. at 2148-49 (noting that a Rule 11(c)(1) violation is not necessarily graver than other Rule 11 violations). For a Defendant to prevail under plain-error review, he must demonstrate on the particular facts of his case not only a plain error, but also a reasonable probability that the error changed his plea decision. Id. at 2150; Sanya, 774 F.3d at 817. The fundamental holding of Davila is that a reviewing court must inquire into whether the district court's statements likely brought about the guilty plea.

This Court recently explained how it conducts such an inquiry. In United States v. Sanya, 774 F.3d at 818, this Court reversed a conviction based on a Rule 11(c)(1) violation. In doing so, the Court specifically credited the "almost immediate effect" of the district court's statements, because Sanya expressed an interest in negotiating his plea at the end of the very same hearing where the court urged him to plead guilty. Id. Sanya then executed a plea agreement just five days after the hearing, leading this Court to explain that "[s]uch close

25

temporal proximity weighs heavily in favor of finding that Sanya's decision to plead guilty was the result of the district court's involvement in the plea negotiations." <u>Sanya</u>, 774 F.3d at 818.

Furthermore, this Court noted, the record in that case "indisputably [bore] out Sanya's contention that when he appeared before the district court, the court had no reason to believe he intended to plead guilty." <u>Id.</u> at 820. There was no signed plea agreement in place at the time the district court made its statements, unlike other cases cited by the government where the defendants had agreed to terms in one or more plea agreements prior to the judge's statements. <u>Id.</u> This Court also considered factors such as whether the same judge would be sentencing the defendant, the content of the judge's statements, and the benefits of the plea agreement as an independent source of persuasion. <u>Id.</u> at 820–21. In Sanya's case, this Court observed, his plea agreement "afforded him little in the way of benefits." <u>Id.</u> at 820.

Judge Wilkinson's concurrence in <u>Sanya</u> further describes the key factors that led to vacatur in that case. Recognizing the Supreme Court's "emphatic holding [in <u>Davila</u>] that Rule 11(c) violations are not structural errors," Judge Wilkinson explained that "other scenarios may be quite different" than Sanya's and may yield different results. <u>Id.</u> at 822–23

26

(Wilkinson, J., concurring). As examples, Judge Wilkinson specifically cited situations with less judicial involvement, or where "the plea agreement, unlike here, was entered prior to the trial court's alleged involvement." _Sanya_, 774 F.3d at 823 (Wilkinson, J., concurring). Additionally, Judge Wilkinson noted that "a longer lapse of time attenuates any causal connection between a trial court's comments and a defendant's decision to plead guilty." _Id._ Judge Wilkinson found the _Sanya_ case "a close one," and he explained that these factors were "[c]rucial to [his] concurrence." _Id._

The _Sanya_ case was "a close one," and the significant differences between that case and this one demonstrate why Defendant's conviction should be affirmed here. First, Defendant did not execute his final plea agreement and enter his guilty plea until nearly four months after the district court made its improper statements.[5] The _Sanya_ defendant, in contrast, executed his plea agreement "[w]ithin just five days of [the] hearing" and entered his plea "within a month." _Id._ at 818 (opinion of the court). The "close temporal proximity" in _Sanya_ "weigh[ed] heavily in favor of finding that Sanya's decision to plead guilty was the result of the district court's

---

[5] The original arraignment occurred on October 15, 2013 (J.A. 58), while Defendant signed the final plea agreement and entered his guilty plea on February 3, 2014 (J.A. 93, 103-04).

involvement." <u>Id.</u>; <u>see also</u> <u>Bradley</u>, 455 F.3d at 464.[6]  Here, the temporal <u>distance</u> weighs in the opposite direction.

Similarly, this Court noted in <u>Sanya</u> that the defendant there experienced a "sudden and significant shift in attitude" during the hearing, which "strongly suggest[ed] that his mid-hearing change of heart was the product of the district court's urging."  774 F.3d at 818.  Here, on the contrary, Defendant gave no indication at the hearing that the court's statements had persuaded him not to back out of the plea agreement he had signed, or that he was convinced at the hearing to again negotiate his plea.  (<u>E.g.</u>, J.A. 71–74).  He stood strong in his position and repeated several times his refusal to fulfill the plea agreement.  (J.A. 68, 71–72, 73–74).

This case simply lacks the "close temporal proximity" and "sudden and significant shift in attitude" this Court found so persuasive in <u>Sanya</u>.  774 F.3d at 818.  Instead, Defendant was not persuaded at the hearing, and "the longer lapse of time" between the hearing and Defendant's eventual plea "attenuates any causal connection between [the] trial court's comments and

---

[6] Temporal proximity was also the key factor in the <u>Bradley</u> case. During the weeks-long trial in that case, the district court repeatedly criticized the defendants' decisions not to plead guilty.  <u>Bradley</u>, 455 F.3d at 464.  The defendants finally changed their pleas during the trial, amidst the court's "repeated interventions and involvement in negotiations."  <u>Id.</u> Thus the court's involvement was closely linked to the plea.

[the] defendant's decision to plead guilty." See id. at 823 (Wilkinson, J., concurring).

The events that occurred during that long lapse of time reinforce this conclusion. After the first arraignment, Defendant's counsel sought for the second time to withdraw from the case. (J.A. 77–79). He had originally sought to withdraw at the first arraignment, citing in large part his difficulty convincing Defendant to agree to the terms of the plea agreement. (J.A. 59–60). After Defendant stated that he was happy with his representation, the court asked defense counsel to give it a few weeks. (J.A. 73–74). Two weeks later, defense counsel successfully withdrew, citing a continued inability to work with Defendant. (J.A. 81). Defendant received new counsel one week later and three months after that entered a guilty plea. (J.A. 11, Docket Entry 136).

These events further suggest that Defendant was not convinced to plead guilty by the district court's statements at the first arraignment, nor was he convinced shortly after the hearing. Had he been, there would not have been cause for his attorney to withdraw. Instead, the events suggest that Defendant continued to refuse to heed his counsel's advice to plead guilty until after receiving advice from his new attorney. These events were intervening causes that serve to further

separate the district court's statements from Defendant's eventual decision to plead guilty.

Furthermore, because Defendant had already signed a plea agreement before the first arraignment, he had indicated a desire to negotiate his plea _prior_ to the district court's improper statements. (_E.g._, J.A. 59). As the _Sanya_ concurrence recognized, it is significant when a defendant had already entered into a plea agreement prior to the improper statements. 774 F.3d at 823 (Wilkinson, J., concurring). It means rather than pushing plea negotiations at the outset, the district court was responding to Defendant's earlier indications that he was willing to negotiate his plea. _Id._ at 820 (opinion of the court). Indeed, this Court's opinion in _Sanya_ distinguished three cases cited by the government on this very basis, explaining that in those cases "the [district] court knew of and reacted to [the defendants'] stated earlier intent to plead guilty." _Id._ at 820. Like in those cases, the district court here "knew of and reacted to" Defendant's signed plea agreement and his earlier stated intent to plead guilty. (J.A. 59). That difference again contrasts this case with _Sanya_ and also with this Court's decision in _Bradley_, where the defendants had repeatedly rejected the government's plea offers prior to judicial involvement and had already begun their trial after pleading not guilty. 455 F.3d at 464.

30

Finally, the content of the final plea agreement is the best explanation for Defendant's decision to plead guilty. Put simply, the benefits to Defendant were enormous. In exchange for Defendant's guilty plea to the superseding information and Counts Twelve through Fifteen of the indictment, the United States agreed to dismiss <u>nine</u> other counts from the indictment. (J.A. 82, ¶ 2.a; J.A. 91, ¶ 4.a). The dismissed counts from the indictment included the Hobbs Act conspiracy (Count One), two bank robberies (Counts Four and Eleven), three other robberies (Counts Two, Five, and Seven), and three violations of 18 U.S.C. § 924(c) (Counts Three, Six, and Eight). The three § 924(c) counts alone would have yielded a mandatory consecutive sentence of <u>57 years</u> on top of any other prison time Defendant received. Put simply, the plea agreement saved Defendant from what would otherwise have been functionally a life sentence.[7]

In <u>Sanya</u>, the Court explained that "the plea agreement Sanya ultimately did sign afforded him little in the way of benefits or concessions from the Government," which further suggested that it was the district court's pre-plea statements that drove Sanya's plea, not the plea agreement itself. 774 F.3d at 820. Here, again, the opposite is true: Defendant

---

[7] Indeed, Defendant's plea agreement was so beneficial, and the evidence against him so strong, that it is hard to imagine what advantage he could possibly gain by undoing the plea agreement in this case.

received a sentence reduction that is best measured in <u>decades</u>. It is no surprise that he entered into this highly beneficial agreement after receiving the same advice from two different attorneys and having months to contemplate the agreement's benefits—particularly given government counsel's indication that Defendant's co-conspirators had pleaded guilty and had agreed to testify against him. (J.A. 69).

In reviewing a district court's involvement in plea negotiations, this Court recognizes that "particular facts and circumstances matter." <u>Sanya</u>, 774 F.3d at 819 (quoting <u>Davila</u>, 133 S. Ct. at 214). On these particular facts, Defendant has not shown a reasonable probability that he would have entered a plea of not guilty. His conviction should be affirmed.

II.    BY ENTERING AN UNCONDITIONAL GUILTY PLEA, DEFENDANT WAIVED ANY CHALLENGE TO THE DISTRICT COURT'S ORDER DENYING HIS MOTION TO SUPPRESS.

A.    <u>Standard of Review</u>.

A guilty plea waives the right to appeal the denial of a motion to suppress unless that right is specifically reserved. <u>Tollett v. Henderson</u>, 411 U.S. 258, 267 (1973); <u>United States v. Moussaoui</u>, 591 F.3d 263, 279 (4th Cir. 2010).

B.    <u>Discussion of Issue</u>.

If the Court affirms Defendant's guilty plea and conviction, then Defendant has waived his argument that the district court erred in denying his motion to suppress.

32

An unconditional guilty plea waives all prior nonjurisdictional errors. Tollett v. Henderson, 411 U.S. 258, 266-67 (1973). This is so because "[a] plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence." United States v. Broce, 488 U.S. 563, 569 (1989). "[D]irect review of an adverse ruling on a pre-trial motion is available only if the defendant expressly reserves that right by entering a conditional guilty plea." United States v. Wiggins, 905 F.2d 51, 52 (4th Cir. 1990) (citing Fed. R. Crim. P. 11(a)(2)).

Defendant's guilty plea was unconditional. The record gives no indication otherwise and Defendant's plea agreement contains no condition reserving the right to appeal the suppression issue. (See J.A. 82-93, 103-04). Defendant makes no argument on appeal that his plea was conditional (see Brief at 4, 16), and he may not, after entering an unconditional plea, "raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." Blackledge v. Perry, 417 U.S. 21, 29-30 (1974) (internal quotation marks and citation omitted). If this Court affirms Defendant's guilty plea and conviction, Defendant has waived his suppression argument and the Court should decline to address it.

33

III.    THE DISTRICT COURT PROPERLY DENIED DEFENDANT'S MOTION TO SUPPRESS BECAUSE NO WARRANT WAS REQUIRED FOR POLICE TO TEMPORARILY INSTALL A TRACKING DEVICE ON DEFENDANT'S VEHICLE, AND BECAUSE THE GOOD-FAITH EXCEPTION APPLIES.

A.    <u>Standard of Review.</u>

When reviewing a district court's decision on a motion to suppress, this Court reviews legal determinations de novo and factual findings for clear error.  <u>United States v. Kelly</u>, 592 F.3d 586, 589 (4th Cir. 2010).

B.    <u>Discussion of Issue</u>.

Defendant argues that the district court erred by refusing to suppress, under <u>United States v. Jones</u>, 132 S. Ct. 945, 949 (2012), evidence obtained by using a GPS tracker on Defendant's vehicle.  (Brief at 16–21).  Defendant's argument fails for two reasons:  First, although <u>Jones</u> determined that the physical trespass of placing a GPS tracker on a vehicle constitutes a search, the Supreme Court did not decide whether such a search requires a warrant.  No warrant was required in this instance because the intrusion was minimal and Defendant's right to privacy was greatly diminished by his supervised-release and home-confinement conditions.  Second, even if the search did violate the Fourth Amendment under <u>Jones</u>, the good-faith exception applies because the search occurred prior to the <u>Jones</u> decision, and this Court has already held that police could reasonably rely on binding precedent prior to <u>Jones</u> permitting warrantless GPS tracking.

34

1.  <u>No Search Warrant Was Required for Police to
    Track Defendant's Car Using a GPS Unit</u>.

The district court correctly concluded that police did not
need a search warrant to attach the GPS unit to Defendant's
vehicle in this case.  While the Supreme Court held in <u>United
States v. Jones</u> that the attachment of a GPS unit to a vehicle
by police is a trespass and therefore a search under the Fourth
Amendment, the Court declined to address if and when such a
search requires a warrant.  132 S. Ct. at 949–50, 954.  If this
Court reaches that question in this case, it should hold that no
warrant was required because the intrusion was minimal,
Defendant's privacy rights were severely reduced due to his
status on supervised release and home detention, and police had
a strong interest in investigating their reasonable suspicion
that Defendant was engaging in violent crimes.

Not every search requires a warrant.  For example, the
Supreme Court has recognized the impracticability of requiring a
warrant for brief investigative stops, which require only
reasonable suspicion.  <u>E.g.</u>, <u>Terry v. Ohio</u>, 392 U.S. 1, 30
(1968).  "The touchstone of the Fourth Amendment is
reasonableness, and the reasonableness of a search is determined
by assessing, on the one hand, the degree to which it intrudes
upon an individual's privacy, and on the other, the degree to
which it is needed for the promotion of legitimate governmental

35

interests." <u>United States v. Knights</u>, 534 U.S. 112, 118–19 (2001) (internal citation and quotation marks omitted). This inquiry looks to the "totality of the circumstances," <u>Samson v. California</u>, 547 U.S. 843, 848 (2006), which may demonstrate that a warrantless search was reasonable.

A defendant's status on supervised release "informs both sides" of the reasonableness test. <u>Knights</u>, 534 U.S. at 119.[8] On the one side, it is "[i]nherent in the very nature" of supervised release that releasees enjoy reduced liberties, including those under the Fourth Amendment. <u>Id.</u> On the other side, the government has an increased interest in observing persons on supervised release because such persons are presumed to be more likely than the average person to commit crimes. <u>Id.</u> at 120. Releasees are also more likely to conceal their activities because they know they are under increased scrutiny and, if caught violating the law, they face additional penalties in proceedings with a reduced burden of proof and fewer procedural rights. <u>Id.</u> These factors, taken together, present "'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 873 (1987).

---

[8] <u>Knights</u> discusses probationers specifically, not persons on supervised release, but the reasoning is the same.

The nature of the search itself also informs whether a search was reasonable. When a search is less intrusive than a physical search of a person or their home, a lesser standard than probable cause may apply. E.g., Terry, 392 U.S. at 29. Just as some persons enjoy reduced liberty under the Fourth Amendment due to their supervised-release status, some searches raise less concern under the Fourth Amendment due to their reduced intrusiveness.

Applying the Fourth Amendment reasonableness test to this case, this Court should conclude that no warrant was required for police to use the GPS tracking device on Defendant's vehicle because 1) the search was minimally intrusive; 2) Defendant had a greatly diminished privacy interest due to his supervised release generally and the conditions of his home confinement in particular; and 3) the government had a strong interest in observing Defendant, both because he was on supervised release and also because police had strong evidence showing that he was engaging in violent criminal activity.

First, the GPS tracking of Defendant's vehicle was minimally intrusive. The tracking device did not record video or audio from the inside or outside of the vehicle. Instead, it provided only Defendant's location, which was almost entirely on public roads where Defendant would be visible to police and the public. (See J.A. 139); see also United States v. Knotts, 460

37

U.S. 276, 282 (1983).  The GPS tracker did not show who was driving the car nor did it reveal any information about the contents of the vehicle or conversations therein.  It was simply a more-efficient means of doing what police can undoubtedly do without any Fourth Amendment concerns: visual surveillance of a vehicle's location on public roads.  While the Supreme Court's decision in Jones leaves no doubt that the physical attachment of a GPS tracking device is a trespass and a search, attaching such a device is far less intrusive than even a typical investigative stop and frisk, which requires only reasonable suspicion.[9]

Furthermore, the Supreme Court has "recognized significant differences between motor vehicles and other property which permit warrantless searches of automobiles in circumstances in which warrantless searches would not be reasonable in other contexts."  United States v. Chadwick, 433 U.S. 1, 12 (1977), abrogated on other grounds by California v. Acevedo, 500 U.S. 565 (1991).  This is partly because of the "inherent mobility" of cars, but the Supreme Court has also approved of warrantless vehicle searches not relating to exigency.  Chadwick, 433 U.S. at 12; see also Cardwell v. Lewis,

---

[9]  In addition, the device was only on Defendant's vehicle for approximately eight hours (see S.J.A. 111–12), unlike in Jones, where the GPS unit "relayed more than 2,000 pages of data over [a] 4-week period," Jones, 132 S. Ct. at 948.

417 U.S. 583, 589-90 (1974) ("The search of an automobile is far less intrusive on the rights protected by the Fourth Amendment than the search of one's person or of a building" (quotation marks and citation omitted)).   Attaching a GPS device to a vehicle is a minimally intrusive trespass on an object already subject to a "lesser expectation of privacy." See Cardwell, 417 U.S. at 590.

Second, Defendant's privacy interest was greatly reduced in this case due to his status on supervised release and home confinement.   E.g., Samson, 547 U.S. at 852.   While Defendant did not have a supervised-release condition specifically consenting to warrantless searches, he did have a condition specifically ordering him to "wear an electronic monitoring device and follow electronic monitoring procedures specified by the probation officer." (S.J.A. 147).   That condition was part of Defendant's home-confinement requirement, which allowed exceptions only for school, employment, and other specified activities. (S.J.A. 147).   That provision gave Defendant full and explicit notice that law enforcement was scrutinizing his location and that he had no interest in or expectation of privacy in that information.[10]   Defendant's conditions of home

---

[10] This Court recently held in United States v. Hill, 776 F.3d 243, 249-50 (4th Cir. 2015), that absent a release condition consenting to warrantless searches, police must obtain a warrant

confinement and electronic monitoring reduced his privacy rights even below the significantly diminished level inherent in supervised release.

Third, the government's strong interest in effectively monitoring Defendant's location, at the specific time they did so, makes the use of the GPS device reasonable. Generally, police have an increased interest in conducting surveillance of persons on probation or supervised release. Knights, 534 U.S. at 592. Specific to this case, the district court concluded that police had "surveillance film and information from interviews that implicated defendant in area robberies, which is sufficient to support a reasonable articulable suspicion that defendant was involved in criminal activity." (J.A. 52 n.1). And importantly, Defendant was engaging in not just crime but violent crime, giving police an especially strong interest in quickly investigating and stopping Defendant's dangerous conduct.

---

before searching the home of an individual on supervised release. The Hill Court rejected the idea that cases such as Knights had overruled a prior Fourth Circuit case disallowing such searches, observing that Knights involved a "warrantless search condition" as part of the defendant's probation. Id. This Court nonetheless recognized in Hill that "'the governmental interest in supervision is great and the parolee's privacy interest is diminished.'" Id. at 248 (quoting United States v. Bradley, 571 F.2d 787, 789 (4th Cir. 1978)). Here, the intrusion fell far short of a search of Defendant's home, and Defendant was subject to a release condition specifically relating to monitoring his home detention.

"The Fourth Amendment prohibits only <u>unreasonable</u> searches." <u>Grady v. North Carolina</u>, No. 14-593, 2015 WL 1400850, at *3 (U.S. Mar. 30, 2015) (per curiam) (on grant of certiorari). The test for reasonableness looks to the "totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." <u>Id.</u> Because the intrusion here was minimal, Defendant's right to privacy was greatly diminished, and the government's interest and evidence were strong, no warrant was required for police to attach the GPS unit to Defendant's vehicle. The district court's order denying Defendant's motion to suppress should therefore be affirmed.

2.    <u>Even If the Search Violated the Fourth Amendment, the Good-Faith Exception Applies</u>.

Even if this Court determines (or simply assumes) that a warrant was required for police to attach the GPS unit, the district court was nonetheless correct to apply the good-faith exception. This Court has already determined that law enforcement officers in this Circuit could have reasonably concluded that binding pre-<u>Jones</u> precedent permitted warrantless attachment of a GPS unit to a vehicle parked in a public lot. <u>United States v. Stephens</u>, 764 F.3d 327, 337–38 (4th Cir. 2014). The <u>Stephens</u> case holds that the good-faith exception applies to

41

pre-Jones GPS searches, and the district court's ruling should therefore be affirmed.

Even when a search violates the Fourth Amendment, the exclusionary rule applies only when it would "deter future Fourth Amendment violations." Davis v. United States, 131 S. Ct. 2419, 2426 (2011). The exclusionary rule is a "last resort, not [a] first impulse," Hudson v. Michigan, 547 U.S. 586, 591 (2006), because excluding reliable, relevant evidence "exacts a heavy toll on both the judicial system and society at large," Davis, 131 S. Ct. at 2427. Therefore, the rule is limited to situations where "police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, [and thus] the deterrent value of exclusion is strong and tends to outweigh the resulting costs." Davis, 131 S. Ct. at 2427 (internal quotation marks and citation omitted).

Based on these principles, the good-faith exception applies when "police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, or when their conduct involves only simple, 'isolated' negligence." Id. at 2427-28 (internal citations omitted). The question is "whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." Herring v. United States, 555 U.S. 135, 145 (2009) (citation and quotation marks omitted). And specific to the facts of this case, the

42

Supreme Court has held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." Davis, 131 S. Ct. at 2423-24. To apply the exclusionary rule in such circumstances, the Court explained, would only "discourage the officer from doing his duty." Id. at 2429.

Defendant argues that prior to Jones there was no binding precedent in the Fourth Circuit authorizing warrantless use of GPS trackers on automobiles. (Brief at 19-21). Defendant is wrong. This Court has explicitly held, in a published case, that the Supreme Court's 1983 decision in United States v. Knotts, 460 U.S. 276, was binding appellate precedent on this very subject. Stephens, 764 F.3d at 338. Specifically, this Court explained that "a reasonably well-trained officer in this Circuit could have relied on Knotts as permitting the type of warrantless GPS usage in this case." Id. Defendant does not discuss or even mention Stephens, but it is both binding and decisive in this case.

The facts in the Stephens case are materially indistinguishable from this one. In Stephens, officers in Baltimore attached a GPS unit to the vehicle of a felon they had reason to believe was regularly in possession of a firearm. Id. at 329. They attached the GPS unit while Stephens's vehicle was parked in a public lot. Id. Officers then used the GPS unit to

43

track Stephens to a nightclub where he was known to work as a
bouncer and carry a firearm while doing so.  *Id.* at 329-30.
Officers arrested Stephens at the nightclub after they found a
firearm in his vehicle.  *Id.*  Stephens filed a suppression
motion based on *Jones*, which was decided while his case was
pending.  *Id.*  The district court held that while the search was
unconstitutional under *Jones*, the good-faith exception applied.
*Id.*

　　　Like Defendant here, Stephens argued on appeal that there
was no binding Fourth Circuit precedent prior to *Jones* allowing
warrantless use of GPS tracking devices on vehicles.  *Id.* at
336-37.   This Court disagreed, citing the Supreme Court's
decision in *United States v. Knotts*, 460 U.S. 276 (1983).
*Stephens*, 764 F.3d at 337.   *Knotts* held that "the use of a
beeper to track a vehicle was not a search under the Fourth
Amendment," and this Court explained that while the *Knotts* case
was not factually identical to GPS tracking, its "legal
principle" was directly on point.  *Stephens*, 764 F.3d at 337-38.
"'*Knotts* was widely and reasonably understood to stand for the
proposition that the Fourth Amendment simply was not implicated
by electronic surveillance of public automotive movements,'"
this Court explained, "and it was the 'foundational Supreme
Court precedent for GPS-related cases.'"  *Id.* at 338 (quoting
*United States v. Sparks*, 711 F.3d 58, 67 (1st Cir. 2013) and

44

then United States v. Cuevas-Perez, 640 F.3d 272, 273 (7th Cir. 2011), rev'd, 132 S. Ct. 1534 (2012)).[11]  The Jones case later proved this view of Knotts to be incorrect, but this Court concluded that, "[w]ithout the benefit of hindsight, however, and with no contrary guidance from the Supreme Court or this Court, we believe that a reasonably well-trained officer in this Circuit could have relied on Knotts as permitting the type of warrantless GPS usage in this case."  Id. at 338.[12]  Defendant's argument to the contrary is meritless, and this Court should affirm the order denying Defendant's motion to suppress.

---

[11] Courts of appeals across the country have reached the same or a similar conclusion in applying the good-faith exception to pre-Jones GPS searches.  See generally United States v. Robinson, No. 13-3253, 2015 WL 1314493, at *10–11 (8th Cir. Mar. 25, 2015) (appendix of circuit cases).

[12] The Court also noted that the its decision was "bolstered" by the fact that the Maryland Court of Appeals had previously held that Knotts was binding precedent in Maryland for determining whether officers acted in good faith prior to Jones.  Id. at 338.  Although North Carolina appears to have had no pre-Jones case law on the use of warrantless GPS searches, the Court of Appeals of North Carolina had recognized that, based on Knotts, "a law enforcement officer's observation of [a] person's movements on a public road is not a 'search' for purposes of the Fourth Amendment."  State v. Parker, 644 S.E.2d 235, 240 (N.C. App. 2007).  Regardless, the Stephens Court was clear that its holding "extends to all law enforcement officers within this Circuit as a matter of federal law."  764 F.3d at 338.

CONCLUSION

For the foregoing reasons, the United States respectfully submits that the judgment of the district court should be affirmed.

Respectfully submitted, this first day of April, 2015.

THOMAS G. WALKER
United States Attorney


BY:  /s/ Phillip A. Rubin_____    ___
PHILLIP A. RUBIN
Assistant United States Attorney
310 New Bern Avenue
Suite 800, Federal Building
Raleigh, North Carolina 27601-1461
Telephone: 919-856-4530

JENNIFER P. MAY-PARKER
Assistant United States Attorney

Of Counsel

<u>CERTIFICATE OF COMPLIANCE</u>

TO BE INCLUDED IMMEDIATELY BEFORE THE CERTIFICATE OF SERVICE FOR ALL BRIEFS FILED IN THIS COURT

1.  This brief has been prepared using (SELECT AND COMPLETE ONLY ONE):

_____    Fourteen point, proportionally spaced, serif typeface (such as CG Times or Times New Roman, NOT Sans Serif typeface such as Arial). Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, CG Times, 14 point):

_____

 X    Twelve point, monospaced typeface (such as Courier or Courier New). Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, Courier New, 12 point):

 Microsoft Word 2010, Courier New, 12 point

2.  EXCLUSIVE of the corporate disclosure statement, table of contents, table of citations, statement with respect to oral argument, any addendum containing statutes, rules, or regulations, and the certificate of service, the brief contains (SELECT AND COMPLETE ONLY ONE):

_____ _____    Pages (give specific number of pages; may not exceed 30 pages for opening or answering brief or 15 pages for reply brief); OR

 X  9,931    Words (give specific number of words; may not exceed 14,000 words for opening or answering brief or 7,000 for reply brief); OR

_____ _____    Lines of Monospaced Type (give specific number of lines; may not exceed 1,300 lines for opening or answering brief or 650 for reply brief; may be used ONLY for briefs prepared in monospaced type such as Courier or Courier New).

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

 /s/ Phillip A. Rubin
_____
PHILLIP A. RUBIN
Signature of Filing Party

CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF user:

James C. White, Esq.
Law Office of James C. White, P.C.


/s/ Phillip A. Rubin
PHILLIP A. RUBIN
Assistant United States Attorney